Mr. Caruso, welcome and come right up and speak with us. And I should say for those of you who may not be familiar with our lighting system, although I know that counsel for the government and counsel for the defendant are fully aware of it, green means, of course, you can go. When you see the yellow light, it's a two-minute warning, and the red light means that your time is up. We would ask you to bring your remarks to a conclusion when the red light goes on. If you're in the middle of answering our question, of course, please help us with the answer. One of my colleagues was fond of saying with regularity that the red light was not aspirational. With that, Mr. Caruso, fire away. May it please the court, Michael Caruso, assistant federal public defender on behalf of Charlie Holley. Charlie did not receive a fair trial or a reasonable sentence in this case. He didn't receive a fair trial because the district court judge allowed the government to introduce five out-of-court statements from unidentified declarants, all which directly implicated him in the charged crimes. Moreover, not only was the introduction of those five pieces of evidence in error, the error was not harmless based on the government's use of particularly one piece of evidence, the 9-1-1 call, three times in their closing argument. Well, what's really hearsay though, counsel, aren't they allowed to explain the course of conduct? No, they didn't offer for the truth of the matter, correct? So this court has given the government slight leeway to introduce hearsay evidence to explain the background or the context of the investigation. Let's look at the facts here. First officer arrives. They're set up for shooting. Fired at the post office. It's chaos. They have to explain why they set up certain parameters, why they call in, quote, the SWAT team. Isn't that not relevant? Explain the course of conduct, complexity here. And also, if it's not hearsay, then the confrontation clause is out. So I agree with that latter point with regard to the body. Let's go back to the other point. The body damage. Why are they not allowed to explain the course of conduct? So they are allowed to explain their course of conduct, Judge Jones. You're absolutely right. Our quarrel was with how they did it in this case. Like, I'm a lapse trial lawyer, right? So when I started trying cases, the government's usual manner of proof was to ask a law enforcement officer, you arrived at the scene, yes. Did you talk to anybody? Yes. Without telling us what they told you, what did you do as a result of hearing that information? I went to my supervisor. What happened here was far, far different. They went far beyond what this court has authorized for the last 50 years. So, for example, the rule in this circuit and in the Fifth Circuit, I cited a trio of cases in my briefing, is that, yes, the government can introduce hearsay statements to explain background or context. But when those statements directly implicate the defendant in the charged crimes and the defendant has not challenged the adequacy of the investigation, then that constitutes inadmissible hearsay. And I don't hear my friend on the other side to say that the statements that we're disputing came into evidence directly implicated Charlie. They absolutely did. And if you review the record, which I know this panel has, there was not a single instance in the trial where the defense was challenging the adequacy of the investigation. So, for example, you mentioned some of the proffered reasons the trial prosecutor and the appellate prosecutor gave, like why and where they set up the perimeter, why they focused on the townhouse. None of those matters were contested. I thought Judge Ruiz was pretty meticulous in admitting that body cam video. He cut it down to six and a half minutes. He gave a pretty strong limiting instruction. He says you should not, and I repeat, not consider any statements made by anyone in these videos as truth of what is being alleged in this case. And he goes on. It was pretty strong. It was pretty strong. He was very, very careful to make sure that what was admitted was not hearsay. It was not admitted for the truth of the matter asserted. So how should we factor that into our analysis? Thank you, Judge Wilson. So I perceive of those as two different areas. One, yeah, we have no quarrel with Judge Ruiz's instruction given his ruling. Our argument is that he erred in ruling that that information was not introduced for the truth of the matter asserted. And if you look at the Fifth Circuit cases we cited in our briefing, Kizzee, Jones, and Hammond, and the cases from this circuit, Rodriguez from the mid-'70s, and Arbelez more recently, those cases are different. In those cases, they found that the conduct was irrelevant that they talked about. Here, the conduct has been found, at least to me, relevant. In those last two cases, courts found that the conduct was irrelevant, therefore making it hearsay. Is that not correct? I would push back, Judge Jones, on that. I think those cases found the evidence irrelevant for the same exact reason we're saying, that the defense in those cases did not challenge the adequacy of the investigation. Charlie's trial lawyers did not challenge the investigatory choices that the police made that day, and that's the same in the trio of Fifth Circuit cases. To follow up on Judge Wilson's point, the judge gives the curator instruction. One of the charges was attempted murder. That's right. The juror found him not guilty of that. Isn't that some indication that the juror is paying attention to the instruction? So, yes and no, Your Honor. One, we think the instruction is irrelevant because the evidence was introduced for the truth of the matter asserted, so it shouldn't have come in at all. And honestly, you know, given the fact that the jury did acquit Charlie of attempted murder, I think strengthens our harmlessness argument because if you look at the government's closing argument, and I'm talking particularly about the 911 call they used in closing, they used it three different times, all from docket entry 135 of pages 96, 103, and 107. They used the 911 call, which, of course, I think the government concedes was introduced in error because they concede that they didn't prove that the declarant on the 911 call had personal knowledge. So the fact that the trial prosecutor in closing hammered the 911 call in closing in light of the fact that the jury found that Mr. Hawley didn't have the intent to murder. But every penal district judge and this judge did the same thing. They told them what the lawyer said in the closing argument is not evidence. I understand, but the trial prosecutor in this case was referring to evidence. He was talking about the 911 call that was entered. So I agree with you, like what the lawyers say is not evidence in terms of, you know, I'll use the colloquial term spin, like a lawyer might spin and that's not evidence. But here they saw it and the judge agreed and they introduced the 911 call, and they used it to devastating effect. And the fact that the jury acquitted on count one, I think, you know, makes our harmless case stronger. Let's take out the 911 call and the body cam video. You've got the assault rifle in evidence. The assault rifle was in his house. You got the shell casings in his townhouse matching the assault rifle. You got Sheila Moss, an eyewitness. She says Hawley pointed the assault rifle at her with threats of harm. You got Charlotte Wicker. She testified that Hawley pointed the rifle at her with threats of harm. You got the bullet hole in the mail truck. Harmless error applies. You know, we obviously think differently, Judge Wilson, or else I wouldn't be here. So what I would point you to is the fact that not a single witness, not Ms. Wicker, not Ms. Moss, testified that they saw Charlie shoot the rifle. That was based on circumstantial evidence. And what the government did through the body cam evidence and the 911 call is essentially introduce direct evidence that Charlie shot at Ms. Wicker because that's the content of at least three pieces of the five pieces of evidence that we're disputing. So that evidence actually gave the government something they did not have from any live witness. And the fact that there's no evidence that the government made any attempt to find these declarants, that they're unidentified, and the judge allowed them to sort of directly implicate Charlie in the conduct, I think shows that this error wasn't harmless. Because I think about it this way. Could the government have called a witness from the neighborhood and elicited an opinion from that witness that essentially said, oh, yeah, the neighborhood knew Charlie shot at the mail lady? No, absolutely not. They would not be allowed to do that. And that's essentially what the government did in introducing these five pieces of disputed evidence. They corroborated Ms. Wicker's account through essentially neighborhood gossip. We have no idea if these people saw what happened or just it was a game of telephone in the neighborhood. I think we have a strong case that this was not harmless based on everything I said. Beyond the issue of harmless error, the first claim you make is that the admissibility of 15C, D, and E, let's just take those three, there were five in all, ran up against Mr. Hawley's Sixth Amendment Confrontation Clause rights. That's an alternative argument, yes, we made. I want you to help me understand why that would be the case. If it was offered for a non-testimonial reason and it was admitted for a non-hearsay purpose, why would there be a violation of the Confrontation Clause? I mean, wouldn't these statements be the kinds of statements that the cops under the circumstances were taking not for the purpose or in contemplation of using a witness in trial? They arrived at a scene. A guy was firing a high-powered rifle out of a window. He shot at a mail truck. Someone had called on 911 saying there's a guy toting a weapon firing away. And they had an emergency circumstance and people told them things. Why would this be testimonial in violation of the Confrontation Clause? So, one, if I may, Your Honor.  And break down your question into two components. Yes, if this court finds that that evidence was not introduced for the truth of the matter asserted, then we don't have a Confrontation Clause issue. Like our point, as I've discussed. Doesn't this evidence, at least in the eyes of the district judge, and you'll have to tell me why our standard here is abuse of discretion, why couldn't the trial judge under these circumstances fairly conclude that these statements came in to explain what the cops did and why they did what they did? They cordoned off the area. They created a perimeter. They brought in hardware. They brought in some kind of armored car. All based upon what these officers had learned from what they were told. This strikes me as non-testimonial in nature for a different purpose. Why is that determination by the trial court an abuse of discretion? Well, so, if I could just unpack that, Your Honor. I think the Confrontation Clause issue this court reviews de novo. The introduction of – But for hearsay purposes. For hearsay purposes, abuse of discretion. I understand. So there are two arguments you're making. Right. One is it was offered for the truth of its contents. It was really hearsay. It ought not to come in. We review that purely for abuse of discretion. I agree with respect to the Confrontation Clause. We have a different standard of review. But why isn't this non-testimonial for purposes of the Sixth Amendment? So, one, Your Honor, and I cited in a 28J letter a recent Supreme Court case where they didn't grant certiorari, but both Justices Alito and Gorsuch filed statements respecting that. And what they say is that the primary purpose test that came out of Crawford has no historical basis. They're not happy with it, but am I not bound by the majority of the Supreme Court of the United States and by what this court has said in the progeny of Crawford? Yes. This is my attempt, like the police in this case, to give some context to the Confrontation Clause. So later, after Crawford, the Supreme Court did decide cases that talked about what is testimonial in terms of a quote-unquote emergency. Now, I think the court has to be careful because oftentimes you hear lawyers talk about this as an emergency exception. There's no emergency exception to the Sixth Amendment. What the Supreme Court has carefully said on a number of occasions is that whether there was an emergency is one factor the court should consider. And what Justices Alito and Gorsuch said is that the primary purpose test from which that emergency doctrine flows has no basis in the history of our country. Let me just read you from what the Supreme Court said. A statement to police are testimonial when the circumstances, quote, indicate objectively that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to a later criminal prosecution. We can agree that's the test, right? We can agree that's what the Supreme Court said. I think in a subsequent case they said you look at statements that were necessary to resolve the emergency. So if we take that as at least one of the foundational principles, why was the district court wrong in concluding quite the opposite, that there was an ongoing emergency? As I said, a guy had already discharged the weapon once, threatened to fire again. They heard that from the postal inspector whose postal truck was shot up. And they got this on a 911 call as well. Why doesn't this fall into that category? So, Your Honor, because the Supreme Court has said that the statements have to be necessary to resolve the emergency. If you look at the evidence in the context of what was happening on the ground, and we don't dispute that there was a crisis that day. We don't dispute that. But what we are saying is that Officer Nehra and Officer Mohammed, the officers who took the body cam footage, they were not interviewing witnesses in order to resolve the emergency. In fact, Officer Nehra testified at trial that he was doing what he did for situational awareness. And so in our view, that's a far cry from statements necessary to resolve the emergency. So we think there was a Sixth Amendment violation, but we think we win on the hearsay issue. Let me ask you just one final question, and you have reserved your full time for rebuttal. Just with regards to the challenge to the admission of Exhibit 14, if my numbers are right, that was the 911 call with the unidentified man. That's right. The recording is muffled, but the caller can be heard saying, quote, that someone shot at the male lady and, quote, said he going to kill everybody, and he's walking around with a semi-automatic rifle. Why wouldn't that be an exception to hearsay anyway, either as a present-sense impression or an excited utterance? Because under – And if the district court reached that conclusion, why would that determination be an abuse of discretion? Two components. Judge, we don't believe that this court has to look at that issue totally under an abuse of discretion, and I'll tell you why. For both the present-sense impression and the excited utterance exceptions, personal knowledge of the declarant is required under Federal Rule of Evidence 602. And what the cases say is that the determination of personal knowledge is a legal underpinning of the rule, which this court reviews de novo. And so that's our – we have many arguments as to why it's not a present-sense or excited – That's just – The declarant didn't have personal knowledge. Just for the – in the interest of the economy of time, let's assume for the moment we were to review it de novo. Why isn't that classically either a present-sense impression or an excited utterance when the declarant is not talking about a past events, quote, he said he going to kill everybody, and, Jaron, he's walking around with a semi-automatic rifle? So two answers, Your Honor. One, the government concedes in their briefing that they did not establish at trial that these statements were based on the declarant's personal knowledge. I think in their briefing they said he may have heard this from someone else. So that alone is a reason why these statements shouldn't be coming to trial. Of course, if you read the actual language. The text says no such thing. The text says he's walking around with a semi-automatic rifle, which suggests just the opposite, which suggests that he's seeing it and it's happening before his eyes as it unfolds. Isn't that a fair inference to draw? It may not be the only inference, but isn't that one fair inference? I don't believe so, Your Honor. I think if you time it up, he was not witnessing these events in real time. And, in fact, and I know we're parsing the statements, but he uses the past tense in these statements. I thought the record reflected that the call was received while 9-11 is on the phone with Charlotte Wicker, the mail carrier. Right. So the facts as I understand them, Judge Wilson, is that Ms. Wicker drives up to the townhouse. There's verbal communication between her and Mr. Holley. She then drives away and calls 9-1-1. She calls 9-1-1 before a shot is fired. She's on the line when the call was received by 9-1-1. It's at the same time. I'll agree you are around the same time, but, again, there's nothing from this man's statement. We don't even know who the record doesn't even establish. The government made a good-faith attempt to find that he was actually pursuing the event. You said one thing you said in response to my question was there's nothing present sense about it. But I read you the language. He going to kill somebody, and even more importantly, and he's walking around with. He's walking around with a semiautomatic. Exactly, Your Honor, because we know he was not walking around from Ms. Wicker and Ms. Moss' testimony. Ms. Wicker and Ms. Moss were absolutely clear that when they saw Charlie that day, he was in the townhouse. So the walking around had to have occurred at some prior point. And, again, I can't stress enough how devastating these statements from an unidentified person who we believe didn't have personal knowledge. If you listen to the call, and I think you have because you mentioned that you found it muffled, the 9-1-1 dispatcher repeatedly asked this man for his address, and he cannot give it. In fact, after the fourth time, the 9-1-1 dispatcher became so exasperated. She asked him, you don't even know your own address? So we think under the rules of hearsay, certainly under Rule 403 and the Confrontation Clause, this evidence should not have been admitted and for the government to allow to hammer this home in closing argument. Thanks, counsel, and you've reserved your full rebuttal. Thank you. Ms. Alloyd. Good morning, Your Honors. May it please the Court. Alaya Alloyd on behalf of the United States. I'd like to first turn to the hearsay arguments that were made. The District Court was well within its discretion in allowing Exhibits 15C, D, E, and E to come in, but not for the truth of the matter asserted. As this Court has held in Kent, there's no bright-line rule like the defendant has cited from the Fifth Circuit that forbids statements that are out-of-court statements for coming in when they implicate a defendant. And in fact, although the defense claims that they did not challenge the investigation here, the District Court made a clear finding that the defendant was raising a theory of identification, and in fact, in the defense's opening statement, the defense clearly argued that because there are no eyewitnesses, the investigation was inadequate because they did not even test Mr. Holley for gunshot residue. So there was clearly a challenge to the investigation here, and it's an adequacy, and that's why the District Court's finding that this was going to go for a non-hearsay purpose, showing an ongoing investigation and the steps taken to identify who shot the rifle, is perfectly relevant and within this Court's rules for when to omit out-of-court statements given to law enforcement. I also want to briefly note that the District Court did make other findings that were important to this determination within its discretion, such as the short nature of the clips, as well as, Your Honors already pointed out, the very strong language in the curative instruction, which this Court has already held in Kent, definitely goes as a very heavy factor weighing in the fact that these types of statements can be omitted and aren't more prejudicial than probative. Finally, Arborales and Rodriguez are distinguishable because the District Court here made a clear finding of the relevance and non-hearsay purpose for the statements, which did not exist in those two cases. So given the very strong limiting instruction, as well as the non-hearsay purpose finding that the District Court made, and the chaos that's been described that was happening at this scene, as well as the defendant's attacks on the government's investigation in trying to figure out who was the assailant in this particular case, we believe that the District Court was well within its discretion in omitting these very brief clips and statements. Let me ask you a question here. Mr. Caruso, counsel argued that the trial judge could have did this a different way. He could have said, okay, counsel, based on what you were told by these individuals, I allowed him to say what was told. What did you do? They're still being allowed to explain their course of conduct, were they not? Yes, they were certainly going to explain the course of conduct. I understand Mr. Caruso's argument that it was not a need for the trial judge to allow the officers to testify what was told to them. What's your response to that? Well, there certainly was a need, Your Honor. As I said, one, the defense attacked the investigation and poked holes at the fact that maybe it was someone else who did the shooting, and so these statements, very brief as they were, go to show that as this ongoing chaotic investigation was going, and in fact, if you look at Ms. Wicker's 911 call, she never identifies who shoots her. So when the police arrive at the scene, they just know some man shot at her, but they don't know who it is. Are you suggesting, then, that the statements were offered for their truth? No, Your Honor. What we're saying is they go to show the— Well, you said they cast doubt on whether he was the shooter. Well, the defense cast doubt on whether he was the shooter. So you offered these documents, these exhibits into evidence to rebut the proposition? No, Your Honor. Maybe I misapprehended. Yes. My point is that they went to go to show the ongoing course of conduct in this chaotic circumstances that the police took when they arrived at the scene. So each of these— It goes back to my question. Did they need to say what was told to them, explain their course of conduct? Why could it not have been based on what Person A told me this is what I did? Well, Your Honor, that is exactly what they used the statements for, based on what Person A told me this is what I did. And this Court's precedents say that's what's allowed when you're offering these kind of non-hearsay statements for not the truth of the matter. To explain, the police can say someone told me X, and here's what I did in response to further the investigation in order to offer clarity on why certain steps were taken next. And that's what happened here. As Officer Nero was testifying, he said someone told me a name, and what we had to do next was figure out who that name belonged to. Who was that shooter? Who was that assailant? Someone else told us something else. We had to follow up on that. So these are exactly the kind of steps and the kind of reasons that this Court has often allowed when accepting these kind of non-hearsay statements. Let me ask you about the 911 call from the unidentified caller who says there's a guy shooting, et cetera, et cetera, et cetera. Was that received in evidence for the truth of its contents because it wasn't hearsay but rather was an exception to the hearsay rule as a present sense impression or an excited utterance? You're absolutely right, Your Honor. That was offered for the truth. Yes, Your Honor. Rather than for some other non-truth function. That's correct, Your Honor. Okay. So help me with that statement. Mr. Caruso makes a series of arguments about the 911 call. Among others, he says, one, we don't know who the caller is, although we can hear with enough clarity what I read into the record. We don't know who it is. We do know, as Judge Wilson pointed out, when the call comes in because the police have that, that the timing is clear and it occurs in the course of the really up front as this saga is ongoing. But he says it's not at all clear that what he is declaring is based upon what he may have visually seen himself. Maybe he was told this by someone else because on this record he says he's walking around and we know from the other witnesses that he was in a room with a window. The window was open. He has a firearm pointed out the window. Maybe he was walking around in the room, but he certainly wasn't walking around on the street or anything like that. And so he says this too undermines the reliability of the statement coming in. It doesn't have a sufficient indicia of truth and reliability. And so the district court erred even if we review it for abuse. That's kind of what I hear him to be saying among other things. Yes, Your Honor. Well, we would like to rebut all of those propositions starting with the fact that as Your Honors already identified, this call takes place exactly at the same time that Ms. Wickers is calling 911 in the same time period. And so that's a very strong indication that it's happening at the exact same moment. And he's observing just like other people could be on the street observing that this is what's happening in that moment. Secondly, we also want to dispute the fact that because he says the man is walking around, that means he's seeing him at an earlier point in time. As the evidence showed, the defendant was in a second floor window that was relatively large. And other officers testified to seeing him pace while he was in that home. So there was definitely space for the defendant to be pacing around. And I think Ms. Wickers' testimony also shows that while he was at the window, he stuck the gun out, he moved around. She saw him move the gun from place to place. And so that's certainly consistent with this 911 caller's testimony as well as Sheila Moss' testimony that the defendant was moving around in his home, could hear her and her nieces moving around. All of that goes to show that there was corroborative evidence that what this anonymous 911 caller was describing was very similar to what our other two eyewitnesses also described of Mr. Hawley's actions. I'm wondering whether you have a strong or harmless error argument given all the other evidence in the case. Mr. Caruso says the body cam video and the 911 call, the government sort of hammered on those during closing argument and during the trial. What is your response to that? Sure, Your Honor. I think our harmless error argument is very strong, and I'd like to separate them out a bit because we did have the 911 evidence come into the trial. So we are clear. Your argument that there was no error at all. That's 100% correct. The argument that there was error, it was harmless because the evidence was overwhelming. That is exactly correct, Your Honor. And as was already detailed when we come to harmless error, one, the government for the body-worn camera footage did not make a single reference to any of those statements in closing argument whatsoever and never relied on them in closing arguments as evidence. But the evidence that the government did use was overwhelming. You have Ms. Wicker's testimony and 911 call describing the brandishing and the pointing of the firearm at her by the defendant. You have Ms. Wicker's testimony and the evidence showing that she identified the defendant in a lineup three days later. You have the bullet hole in her truck, which Ms. Wicker's testified was not there in the morning but was certainly there after the shooting, and the government also producing law enforcement testimony showing that they found a bullet hole and fragments of a bullet. You have the rifle being found in the house. You have the protective sweep done as soon as the defendant walked out, showing that no one else was in that home. You have the live ammunition in the defendant's bedroom. You have the shell casing consistent with being shot from that rifle. Without the 911 call or any of this body-worn camera footage ever coming in, which again was not relied on by the government, that is overwhelming evidence that on this day there was one person in the house, the defendant, and the rifle that he admitted to, there was no contesting of the possession charges here. All we're looking at is whether or not it impacted the brandishing and the assault. And you have a witness herself coming in and identifying the defendant as a person who brandished a rifle at her as well as hearing the firearm be discharged after he brandished it at her. You have another witness testifying that that similar behavior was done by the same person. And then you have all the physical evidence in the protective sweep that was done after he was arrested. That is overwhelming evidence that established all the elements of the contested charges of assault of a federal worker as well as the discharge and brandishing of a firearm. Counsel, I'd like to go back to a question that you were asked that was raised earlier by Judge Jones. And I'm talking specifically about Exhibits 15C, D, and E. I'm not talking about the 911 call but rather what the cops picked up on the video cam when they came to the scene. Yes, Your Honor. Your argument is it doesn't violate the Confrontation Clause because it was non-testimonial in nature. Correct. It wasn't gathered for the purpose of making a case or using it in a court of law later but rather to explain why the cops did what they did when they arrived at this emergency dangerous circumstance where a guy had already fired a weapon once. He was in the window and he had the weapon.  The question is did you really need these statements in order to explain why the cops were there? Your Honor, I… The cops have said we had indication that a weapon had been fired. That could have been so, Your Honor. And we cordoned off the area for all of these reasons of safety without actually receiving in evidence C, D, and E. That could have been so, Your Honor. But there are two things I'd like to point out for that. One, we're under abusive discretion when it comes to the hearsay issue. And the District Court has a wide discretion in allowing this type of evidence, especially when you consider how brief the clips were and the very strong curative instruction. But also if you just look at the briefness of the out-of-court statements that were let in, one from 15C was just we call him white boy. That's the statement really. That's the target statement from that. But you also hear over the radio, which is important for context, that the police officers are trying to find someone who came out of the actual target residence so we can get information. And then the radio says something along the effects of nobody came out of the target residence. But they don't know any of these things for certain. And that's why having these kind of clips come in give context to why they take step after step. And certainly we're within the wide discretion of the District Court to admit for this very small and these very brief clips for a very limited purpose with a very strong curative instruction. But to your confrontation clause point. They said we call him white boy was involved. They didn't say we call him white boy. They pointed out, they says they believe highly a white boy was involved. So it went beyond just identifying him as white boy. Well, originally it was white boy, I think if that's 15C. 15E is just the Spanish interpretation of the person is potentially a light-skinned, tall male. 15D is actually very interesting if your honors look at the clip. The police actually were worried that there was someone else who could have had a gun and were asking this woman who had come down, is your boyfriend the one we're actually looking for? And then she clarifies, no, it's not my boyfriend who has a gun. No one next door has a gun. The only person who has a gun is the person next door. And he's called white boy. So that's another instance of showing there was confusion and still uncertainty about what was going on and how the police continued to conduct their investigation and show those next steps to explain in this very chaotic scene with an active shooter who was barricaded. And as you look at the clips, in a very large area with housing and fields and all sorts of things behind it, who exactly the police were looking for? I think if you look at Officer Mohammed or Sergeant Mohammed's testimony, he even states, you know, even as they were developing all this information, when someone came out of the house, they still weren't sure who that person was or if it was their suspect. So this is an ongoing investigation with a lack of information. And it was important for the jury to have that context because there were challenges that the defense raised to the investigation itself. But turning to the Confrontation Clause issue, we think even if you set aside the hearsay, this was clearly non-testimonial under all of the indicators that the Supreme Court has identified in Bryant, which is, one, that the ongoing emergency is among the most important circumstance. And we clearly had an ongoing emergency here. Given the fact that there was an active shooter who was barricaded in his home, we had no idea if this was a private or public dispute. We knew that it was not a private dispute because all of the witnesses who testified had no idea why Holly was pointing a gun at them. We also know under the factor of informality that this took place in an exposed area in a public place. It was disorganized, quick interviews. They weren't structured. It was a fluid situation. It was near the scene of the crime. All factors that the Supreme Court and Bryant have identified as primary purpose going to ongoing emergency. And the statements and actions and the nature of what was asked and answered also go to that. You have Officer Nira testifying. He didn't really interview people or take names. He was just trying to gather information as quickly as possible to relay over the radio because they didn't know who they were encountering. And they needed to have information to figure out what was going to happen if they approached this house where a high-powered rifle with maybe a scope was located. What were they going to do? How was SWAT going to actually resolve this emergency? We know it didn't even get resolved until SWAT appeared on the scene. And maybe it took about an hour and a half, two hours to finally resolve this. So this clearly under all the factors identified, Bryant was an ongoing emergency. And these clips represented non-testimonial information. All right. If you could bring your remarks to a conclusion, counsel. Anything further? Judge Wilson. Other than that, sorry. Let me ask you just one thing. It wasn't raised by Mr. Caruso in his first statement, although it was briefed. I want to give you just a moment to address the sentencing issue. He argues that the sentence was substantively unreasonable because the district court failed to adequately weigh the impact Mr. Hawley's mental health crisis had on the commission of the offense. Do you want to take a moment and just address that? And so we'll give Mr. Caruso a chance to illuminate that issue if he wants to. Very briefly, Your Honor. That is completely disproved by the record. The district court explicitly noted on the sentencing transcript on page 21 as well as pages 37 through 39 that it looked at the letters of support, reviewed the memorandum filed by the defendant, noticed the request for the defendant's request for a downward departure in variance, and acknowledged that there were some well-documented concerns with mental health in this case. But the court looked at all the other sentencing factors, including the seriousness of the offense, deterrence, and the protection of the public and respect for the law, and decided that while the mental health concerns were important and would impact the sentence, it did not warrant a downward variance or a departure from the mandatory minimum, but instead meant that the district court was going to sentence at the bottom of the guidelines instead of the top of the guidelines. That sort of explicit statement under this court's precedent is far and away more than enough to show the substantive reasonableness, especially given that the court imposed a guidelines-range sentence, which has a sort of presumption to be reasonable in this particular case. So given the seriousness of this offense, the fact that the district court considered multiple factors, acknowledged the mental health concerns, and allowed them to impact the sentence that was imposed, we don't think there's any issue of an unreasonable sentence here substantively. Thank you very much. That we ask that you affirm. Mr. Caruso, you've got the final word. You've reserved four minutes for rebuttal. I think you have the final word, but I'll take your statement. So with regard to the standard of review, I want to be careful to note, and if this wasn't made clear in the briefing, I apologize, but this court's standard of review to determine whether a statement is hearsay or non-hearsay, I understand that to be de novo because that's a legal determination. Whether a statement fits within one of the hearsay exceptions, that is an abuse of discretion.  So if the district court were to conclude that the 9-1-1 call comes in for the truth of its contents because it was a present-sense impression or alternatively because it was an excited utterance, we would be obliged, we would be required to review that only for abuse, right? Yes, but the predicate for that, whether the declarant had personal knowledge, is reviewed de novo. Got it. I also want to talk about the Kent case that my friend mentioned. Kent is very interesting. It's a recent case from this court. It involves an out-of-court statement made by an investigator at a preliminary hearing, which the district court allowed to come into evidence, in which this court affirmed the introduction of that evidence. But if you read that opinion, and I think it's on page 1220, the district court judge redacted from that out-of-court statement any mention that directly implicated Kent in the crime, which is murder. And so that's exactly our point here. Like we had previously discussed, and I see that my friend has acknowledged that there are a number of ways that the government could have introduced this context information without introducing these highly inculpatory statements. So we think Kent helps us in that the district court judge carefully redacted the direct references that the declarant made to Kent committing the murder. We would also ask this court, as we know you will, to carefully review the record because I don't think it's a fair characterization of the defense in this case to say that they attacked the investigation. So there was a cross-examination question about gun residue, but these statements were introduced not to show whether they should have tested the gun or not, but whether they should have established the perimeter where they did and when they did, and to other facts. And if you look at the opening statement, if you look at the cross-examination, if you look at the closing argument, there was no attack on the adequacy of the investigation that would lead that these highly inflammatory and prejudicial statements would come into evidence. And in fact, what had happened in this case is essentially Judge Ruiz made his admissibility determinations pre-trial. So if you look at the trial record, both parties open, and then the government immediately introduces all the disputed evidence before any government witness is cross-examined. So I think that is a strong point in our favor that this was an error. And with regard to the harmless error inquiry, I want to be careful to note there was not a single witness who testified that they saw Charlie shoot the rifle. The only evidence that came in at trial was from this disputed evidence. And as the government – Wasn't there evidence from the FBI, what they found in his apartment? They found firearms. They found bullet casings and so on and so forth. And didn't they match that up with the bullet that hit the postal truck? Yes, Your Honor. I'm talking about direct evidence from Ms. Wicker from this moment. No, I understand. But I'm talking about the forensic evidence. Didn't that directly tie your client to the shooting? Well, I wouldn't say it tied him directly to the shooting. It tied him to the house. It tied him to the gun, and that's the reason why the defense conceded. He occupies the house. Somebody is waving a gun from that apartment. Somebody fires a shot. The firearm is found in his apartment thereafter. Casings, shell casings are found in the apartment, and they match up with the bullet hole in the postal vehicle. Strikes me as clearly circumstantial, but strikes me as pretty significant circumstantial evidence, isn't it? So, again, we would agree that that is circumstantial evidence, and that's why we didn't raise a sufficiency argument on appeal. But I think you have to put this issue in the context of what the witnesses said who came to court, raised their right hand, gave their name, versus the unknown people in the community who gave the most damning testimony at the trial that Charlie's lawyers never had a chance to cross-examine or confront. To this day, we still don't know who these people are. And finally, with regard to the 911 call, you know, I heard my friend talk about personal knowledge. It is crystal clear in the government's briefing they concede they did not prove the 911 caller had personal knowledge, and for that reason alone. Am I bound by that concession, having listened to it, having dated the timing of the call, and having heard the words said? So you're not bound by a concession, but I think the trial prosecutor and the appellate brief writer, their conclusion from listening to the tape and, you know, trying the case and reviewing the case, I think, should be given significant weight. And as we previously discussed, on the 911 call, this caller cannot even give his address. So we don't know where he was calling for at the time. And for all these reasons, Your Honor, we think you should vacate Charlie's convictions and his sentence. Thank you, and happy holidays. Thank you very much, Mr. Caruso. And thank you, counsel, for the United States. Ms. Lloyd, the case was well argued by both sides, and we appreciate your efforts. We will proceed to the next case.